IRVING, P.J.,
for the Court:
¶ 1. Lula Cogan is a dominant-estate owner of an express easement located on land owned by her brother, Steve Muir-head. Lula sued Steve in the Chancery Court of Warren County, alleging that Steve had intentionally and maliciously destroyed the easement. Lula also alleged that Steve had denied her legal access to her land, which made her land worthless. Steve filed a cross-complaint, alleging that Lula had failed to maintain the easement and had damaged the easement and his property. Following a two-day trial, the chancery court awarded Lula compensatory damages, punitive damages, and attorney’s fees. Steve appeals, arguing that the chancery court erred by awarding Lula damages and attorney’s fees.
¶ 2. For the reasons that we shall discuss, we affirm in part and reverse and remand in part.
FACTS
¶ 3. Lula and Steve, along with their siblings, inherited from their parents land situated in or near Vicksburg, Mississippi. This included the private portion of Muir-head Road.[1] In 1979, the siblings divided the land via a partition deed. In the deed, the siblings reserved a twenty-foot-wide easement over the parcels of land that were given to Marvin Muirhead and Lula. The easement allowed for the extension of Muirhead Road so that Marvin, Lula, and Steve could access their property. At some subsequent point, Steve purchased Marvin’s portion of the land. Steve used the easement to access his house, and built a fence along both sides of the easement. Lula, who owns land to the east of Steve’s land, also used the easement to access her land so that she could work in her gardens and cut timber. In or around 1994, Steve’s son, Ronnie, built a house and began using the easement to access his house.
¶ 4. When Ronnie began using the easement, Ronnie purchased gravel and, with Steve’s help, placed the gravel on the lower portion of the easement.[2] Because the *1261 easement has a steep downhill slope, rainfall would wash the gravel downhill. On several occasions following heavy rainfall, Ronnie would replace the gravel that had washed to the bottom of the easement.
¶ 5. In 2005, Steve asked Lula to contribute $3,000 toward the maintenance of the easement, but Lula declined to do so. Instead, Lula asked Pete Buford, a construction worker who owns a construction business, to determine whether the easement needed any work. After performing an assessment, Pete provided Lula with a written report, dated July 26, 2005, a portion of which we quote verbatim:
On 7/20/05 I met with Lula ... to examine and give her my professional opinion on [the easement]. Gravel on the said [easement], after three (3) probes were taken, was six to eight inches deep (6" to 8") .... I informed [Lula] at this time I could see no need for any maintenance on this piece of property.
[[Image here]]
The depth of gravel was checked on ... the easement, the first being at [foot] of a hill which was measured at Eight and one half inches (8 1/2") of gravel. Another probe was taken in the middle of hill, and gravel measured Seven and one half inches (7 1/2"). It was opinion [sic] that this part of the easement needed no gravel or maintenance at this time.
¶ 6. In 2006, Ronnie built a road that intersected Muirhead Road. After the new road was built, both Steve and Ronnie abandoned the easement and began using the newly built road to access their houses. Ronnie also installed a culvert near the intersection. The culvert directed water away from the newly built road and onto the easement. Also in 2006, after the new road was built, most of the gravel was mysteriously removed from the easement. At some point after the gravel was removed, dirt from the center of the easement was pushed up onto the sides of the easement. After that, a large v-shaped ditch was dug across the easement, preventing vehicular use of the easement.
¶ 7. In 2007, Lula hired Pete to perform conservation work on her property. To access Lula’s property, Pete and his employees had to use the easement. To make the easement usable, Pete instructed one of his employees, Marcus Clark, to fill the v-shaped ditch with dirt. Marcus complied. However, shortly thereafter, a trench, which was approximately four feet deep and five feet wide, was dug in the center of the easement. As a result, water settled in the center of the easement, causing severe erosion. By 2008, the easement had almost completely eroded.
¶ 8. In her complaint, Lula alleged that Steve had destroyed the easement by: (1) removing the gravel, (2) installing the culvert, (3) erecting metal posts on the easement, and (4) digging the trench. Lula also alleged that Steve had restricted her access to her land. In his cross-complaint, Steve alleged that in 2007, Lula authorized Pete to dig ditches on the sides of the easement, causing damage to Steve’s fence and land. Steve also alleged that the damage to his property had been caused by Lula’s failure to maintain the easement.
¶ 9. During trial, Lula admitted that she had never contributed financially toward the maintenance of the easement. She testified that in 2005, after consulting with Pete, she believed that no maintenance was needed on the easement. Lula also admitted that she had not witnessed Steve or Ronnie remove the gravel from the easement in 2006. However, Lula indicated that she believed that Steve had used his machinery to remove the gravel. Lula testified that she believed that after Steve removed the gravel from the easement, he used a bulldozer to push the dirt up on the sides of the easement. She denied authorizing Pete to dig ditches on the sides of *1262 the easement. Lula believed that Steve had used a'track hoe to dig the trench in the center of the easement.- She stated that she did not own any machinery that she could have used to push the dirt up onto the sides of the easement, to dig the v-shaped ditch, or to dig the trench. Lula also testified that the destruction of the easement prevented her from working in her gardens and from cutting timber from her land because she no longer had legal access to her land.[3]
¶ 10. Pete testified as an expert in the field of earthmoving-heavy-equipment operation. He stated that because there was at least six inches of gravel on the easement in July 2005, he had seen no need to add more. However, according to Pete, by the time he performed the conservation work on Lula’s land in 2007, all of the gravel that was on the easement had been removed. Pete admitted that in order to reach Lula’s property to perform the conservation work, he “had to smooth the tv-shaped ditch] up[.]” However, Pete denied digging ditches on the sides of the easement, or making any changes that would cause the easement to erode. He also denied instructing Marcus to dig ditches on the sides of the easement. Pete opined that someone had used earthmov-ing machinery to create the v-shaped ditch and dig the trench in the center of the easement. Pete testified that at the time of trial, the cost of repairing the easement was approximately $27,000.
¶ 11. Henry Muirhead, Lula and Steve’s cousin who formerly worked in the construction business and who lives near Muirhead Road, testified that before Lula had the conservation work performed on her property in 2007, she asked him to advise her as to what work should be done. Henry stated that he, therefore, visited Lula’s property with her, and he observed that the easement was “just about impassable to a vehicle.” He also stated that he ■witnessed Pete repair the v-shaped ditch on the day that the conservation work was performed. Henry testified that he had not seen any evidence that Pete had “dug out any ditches or anything” on the easement. Henry also testified that after Pete completed the conservation work on Lula’s property, he witnessed earthmoving machinery operating on the easement around the time that someone dug the trench in the center of the easement.
¶ 12. Lula and Steve’s brother, James Muirhead, who was eighty years old, testified that he was familiar with Muirhead Road. During his testimony, James relied on notes prepared by Lula, but he stated that he had personal knowledge of the events about which he testified. James stated that in August 2006, he witnessed someone, using gravel trucks owned by Steve, remove the gravel from the easement. James also testified that someone had used a track hoe to dig the trench in the center of the easement. He believed that Ronnie owned the track hoe that was used to dig the trench.
¶ 13. Mike Cogan, Lula’s son, testified that he believed someone had used machinery to dig the v-shaped ditch. Mike admitted that he instructed Marcus to fill the v-shaped ditch but denied authorizing Marcus to dig ditches on the sides of the easement. Mike believed that Steve had instructed Butch Bryant, a machinery operator, to dig the trench in the center of the easement.
¶ 14. Steve testified that he and Ronnie built the road because Lula refused to *1263 contribute to the maintenance of the easement. Steve also testified that he and Ronnie installed the culvert because they “couldn’t build the other road and keep letting water run across [it.] [S]o, [they] put a pipe across there where it wouldn’t wash the ditch across the new road.” Steve denied removing the gravel from the easement in 2006, and he stated that he believed that the v-shaped ditch had been caused by erosion. Steve admitted that he had asked Butch to remove the dirt from the center of the easement, which created the trench. Steve stated that he instructed Butch to “take the dirt out of the center of that [easement], whatever it took to fix them sides.” He testified that had he not removed the dirt from the center of the easement, he would have had to purchase soil to place on the sides of the easement in order to support his fence. Steve also testified that although he knew that digging the trench in the center of the easement was not the most appropriate action to take under the circumstances, he believed that he was justified in removing the soil from the center of the easement because Lula had refused to help maintain the easement. Steve insisted that Lula had instructed Pete to dig the ditches on the sides.
¶ 15. During his testimony, Ronnie denied removing gravel from the easement in 2006. According to Ronnie, all of the gravel that was on the easement in 2006 had washed to the bottom of the easement and had remained there. Ronnie testified that Lula did not start having problems with the easement until after Pete performed the conservation work and until after the trench was dug in the center of the easement. According to Ronnie, heavy rainfall, not the trench, had caused the easement to erode.
¶ 16. Marcus, who was employed by Ronnie at the time of trial, testified that in 2007, Mike and Pete had instructed him to remove dirt from the sides of the easement and to place that dirt in the center of the easement in order to fill the v-shaped ditch. Marcus stated that Mike and Pete had also instructed him to get as close to Steve’s fence as he could when removing the dirt from the sides of the easement.
¶ 17. George Hammit, an engineering expert hired by Steve, opined that the erosion of the easement had been caused by the easement’s downhill slope. George stated that he had seen no evidence that suggested Steve had caused the destruction of the easement. George testified that he was informed that Steve had performed “some immediate work [to the easement] and [had] reshaped it and put the dirt back in the ditches to protect his property and have it shaped like a V in the middle to carry the water.” George opined that the v-shaped ditch had been a functional, though destructive, way of supporting the fence and of preventing the erosion of the sides of the easement. He admitted that a trench in the center of any road would cause severe erosion.
¶ 18. In its final judgment, the chancery court found that James’s testimony was credible despite the “cheat notes” that James had used during trial. The chancery court also found that Marcus’s testimony was not credible because Marcus was employed by Ronnie at the time of trial. The chancery court concluded that Lula had not been required to make the suggested repairs in 2005 because those repairs had not been necessary. Additionally, the chancery court found that Steve had wrongfully destroyed the easement by removing the gravel, digging the ditches on the sides of the easement, digging the v-shaped ditch, and digging the trench. The chancery court found that the digging of the trench “was the final death blow to the easement.” The chancery court awarded Lula $26,500 in compensatory *1264 damages. Citing Jones v. Music, 2 F.Supp.2d 880 (S.D.Miss.1998), as precedent on the issue of punitive damages, the chancery court also awarded Lula $10,000 in punitive damages and $11,119.35 in attorney’s fees.
DISCUSSION
¶ 19. “When reviewing the findings of fact of a [chancery court, an appellate court] applies the ‘manifest error/substantial evidence rule.’” Warren v. Derivaux, 996 So.2d 729, 734 (¶ 10) (Miss.2008) (quoting Miss. State Tax Comm’n v. Oscar E. Austin Trust, 719 So.2d 1172, 1173 (¶ 7) (Miss.1998)). “[An appellate court] is prohibited from disturbing the findings of [a chancery court] unless they are ‘manifestly wrong or clearly erroneous.’” Id. at 734-35 (¶ 10) (quoting Bowers Window & Door Co. v. Dearman, 549 So.2d 1309, 1312 (Miss.1989)). An appellate court will not reweigh evidence or reconsider the veracity of witnesses or the credibility of evidence, as “[weighing the credibility of witness[es’] testimonies] is the [chancery court’s] proper role and duty.” Joel v. Joel, 43 So.3d 424, 435 (¶ 41) (Miss.2010) (citing Bell v. Parker, 563 So.2d 594, 596 (Miss.1990)). “[An appellate court], however, reviews issues of law under a de novo standard, and will reverse if the law has been applied or interpreted erroneously.” Warren, 996 So.2d at 735 (¶ 10) (citing Miss. Transp. Comm’n v. Fires, 693 So.2d 917, 920 (Miss.1997)).

I. Compensatory Damages

¶ 20. Steve argues that the chancery court erred by awarding compensatory damages because the evidence established that Lula destroyed the easement. Alternatively, he argues that he was not solely responsible for the damage. He cites Kennedy v. Anderson, 881 So.2d 340 (Miss.Ct.App.2004), as support for his argument.
¶ 21. In Kennedy, the dominant-estate owner filed a complaint against the ser-vient-estate owners, claiming that the ser-vient-estate owners had interfered with his use and enjoyment of an express easement by, among other things, destroying the easement. Id. at 342 (¶ 1). The servient-estate owners counterclaimed, alleging that the dominant-estate owner’s use of the easement had damaged their fence, their property, and the easement itself. Id. at 344 (¶ 12). There, the chancery court found that although “there had been some accusations and insinuations from both parties[, there had been] no evidence as to what party, if any, was responsible” for the damage to the easement. Id. at 347 (¶ 33). The chancery court also found that neither party was entitled to compensatory damages. Id. at 345 (¶ 14).
¶ 22. On appeal, as to the rights and obligations of each party, this Court found:
Where a private right of way exists, the owners of the dominant and servient [estates] must each use the way in such a manner as not to interfere with one another’s utilization thereof. An easement for ingress and egress is a straightforward concept that encompasses surface use and whatever improvements and maintenance to the roadway that are necessary to permit continued travel. As a result, the owner of the dominant estate is entitled to work on the easement at his own expense so as to keep it reasonably usable as a road.
Id. at 346 (¶ 25) (internal citations omitted). As to the chancery court’s refusal to award damages, this Court also found:
Damages may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty. In addition, damages are not recovera *1265 ble where it is impossible to say what of any portion of the damages resulted from the fault of the plaintiff and what portion from the fault of the defendants] themselves.
Id. at 347 (¶ 32) (internal citations omitted).
¶23. Kennedy is distinguishable from the case now before this Court. As stated, based on the testimony and evidence presented at trial, the chancery court found that Steve had destroyed the easement by having the trench dug in the center of the easement, which the chancery court found was the “final death blow[.]” Further, Steve admitted that he instructed Butch to remove the dirt from the center of the easement, which formed the trench, because he wanted to use that dirt to support his fence. As there was substantial evidence to support the chancery court’s finding, we are required to defer to the chancery court’s conclusion that Steve destroyed the easement. This issue is without merit.
¶24. We briefly discuss Steve’s argument that the chancery court erred by finding James’s testimony credible despite James’s reliance, during his testimony, on notes prepared by Lula. As noted, the chancery court was in the best position to determine the veracity of each witness and the credibility of the evidence presented during trial. James testified that he had personal knowledge of the events that he testified to, and there is nothing in the record that indicates that the chancery court abused its discretion by admitting James’s testimony. This issue is without merit.

II. Punitive Damages

¶ 25. Steve argues that the chancery court erred by awarding punitive damages after: (1) applying an improper legal standard and (2) failing to hold an evidentiary hearing on the issue of punitive damages. Second, Steve argues that the chancery court erred by finding that the erroneous award of punitive damages was a proper basis for the award of attorney’s fees. Finally, Steve argues that the chancery court erred by finding James’s testimony credible because James relied on notes prepared by Lula. On the other hand, Lula asserts that a careful reading of the final judgment reveals that the chancery court utilized the clear-and convincing standard in finding that Steve’s actions were malicious.
¶26. In Jones, which the chancery court relied on in assessing punitive damages, the United States District Court for the Southern District of Mississippi indicated that the standard to be applied during a court’s assessment of punitive damages is a preponderance-of-the-evidence standard. Jones, 2 F.Supp.2d at 884 (finding that “[p]unitive damages may be awarded only when the trier of fact is persuaded by a preponderance of the evidence that defendant’s actions were wanton, malicious[,] or fraudulent in nature.”) Likewise, in its final judgment, the chancery court found that “[p]unitive damages may be awarded only when the trier of fact is persuaded by a preponderance of the evidence that [the] defendant’s actions were wanton, malicious[,] or fraudulent in nature.” The chancery court further found
that [Steve’s] conduct was malicious, intentional[,] and outrageous. The court finds that removing the gravel that he bought and put on the easement, and cutting a vee down the easement, was spiteful. However, after the easement was made usable following these acts, regardless of who deepened the ditches (which the court believes was an act of [Steve]), digging the trench down the middle of the easement under the guise of saving his fence[] was clearly malicious, intentional[,] and outrageous. [Steve], as a farmer[ ] who retired from *1266 the construction business[,] knew that this action would destroy the easement (and having destroyed the easement, [Steve] now seeks to abandon it). He knew that he could take other, less invasive, remedial actions. He never discussed the fence situation with [Lula] to ascertain the best remedial action; therefore, he was not interested in finding the best solution or in saving the easement. Obviously, he wanted to prevent [Lula] from using the easement regardless of her right to use the easement. Through this aggressive action, which he even admits was wrong, [Steve] showed an intentional[,] wanton disregard for the rights of [Lula], and Lula is entitled to punitive damages in the amount of $10,000.
¶ 27. We find that the standard enunciated in Jones is in clear conflict with Mississippi statutory law. Mississippi Code Annotated section 11-1-65 (Rev.2014) provides, in relevant part, as follows:
(1) In any action in which punitive damages are sought:
(a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.
[[Image here]]
(c) If, but only if, an award of compensatory damages has been made against a party, the court • shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.
[[Image here]]
(f)(i) Before entering judgment for an award of punitive damages the trial court shall ascertain that the award is reasonable in its amount and rationally related to the purpose to punish what occurred giving rise to the award and to deter its repetition by the defendant and others.
(ii) In determining whether the award is excessive, the court shall take into consideration the following factors:
1. Whether there is a reasonable relationship between the punitive[-]damage award and the harm likely to result from the defendant’s conduct as well as the harm that actually occurred;
2. The degree of reprehensibility of the defendant’s conduct, the duration of that conduct, the defendant’s awareness, any concealment, and the existence and frequency of similar past conduct;
3. The financial condition and net worth of the defendant; and
4. In mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct.
¶ 28. Despite Lula’s argument to the contrary, it is unclear whether the chancery court required Lula to prove by clear and convincing evidence that Steve’s actions were malicious. However, the chancery court’s reliance on Jones suggests that the court, applied the lesser standard. Additionally, the record does not reveal that the chancery court conducted an evidentiary hearing on the issue of punitive damages, or that the chancery court ascertained that the punitive-damages award was reasonable in its amount and rationally related to the purpose of deterrence. Furthermore, the chancery court failed to consider the factors enumerated in section 11 — 1—65(f) (ii). Therefore, we find that the chancery court erred *1267 by awarding punitive damages in this case. Consequently, we reverse and remand for an evidentiary hearing wherein the chancery court must determine by clear and convincing evidence whether Steve’s actions were willful, wanton, and malicious. If, on remand, the chancery court finds that punitive damages are warranted, then the chancery court must consider the factors enumerated in section 11 — 1—65(f)(ii) in determining the amount of punitive damages to be awarded.

III. Attorney’s Fees

¶29. Steve argues that “[bjecause the award of punitive damages was inappropriate, this Court should reverse the [chancery court’s] decision to award attorney’s fees[.]” Steve insists that even if the award of punitive damages was proper, the chancery court should not have awarded Lula attorney’s fees because her damages were caused by her own actions or inac-tions. Lula argues that the chancery court’s award of attorney’s fees was proper, and asks this Court to award her attorney’s fees on appeal.
¶ 30. It is well established that attorney’s fees may be awarded where punitive damages are proper or where there is an independent basis for an award of attorney’s fees. See Fulton v. Miss. Farm Bureau Cas. Ins. Co., 105 So.3d 284, 287-88 (¶ 16) (Miss.2012) (citation omitted) (finding that “Mississippi has long followed the American rule [that even] ‘absent some statutory authority or contractual provision, attorneys’ fees [may] be awarded [if] punitive damages are also proper’”).
¶31. The evidence does not establish that independent grounds for an award of attorney’s fees exist in this case. Therefore, the only possible basis for the award of attorney’s fees was the punitive-damages award. Because this Court reverses and remands on the issue of punitive damages, the Court also reverses and remands on the issue of attorney’s fees, pending resolution of the punitive-damages issue. However, we affirm the award of compensatory damages.
¶ 32. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ„ CONCUR. JAMES, J., NOT PARTICIPATING.

. Apparently, a portion of Muirhead Road is considered to be a public road because Warren County maintains part of it. This appeal involves only the private portion.

. Before Steve and Ronnie placed the gravel on the easement, it was covered with hardpan dirt.

. Lula was able to access her land by traveling across land owned by one of her other siblings. However, her argument at trial was that she did not have legal access to her land because there was no legal document giving her the right to travel across her sibling’s land, as was the case with the easement.