# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00125-COA

**DAVID W. ALFORD**

**APPELLANT/ CROSS-APPELLEE**

v.

**COTTON ROW HOSPITALITY, LLC**

**APPELLEE/ CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2022 |
| TRIAL JUDGE: | HON. CATHERINE FARRIS-CARTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | SHELDON G. ALSTON WARREN KENDRICK ROGERS JR. JACOB ARTHUR BRADLEY |
| ATTORNEYS FOR APPELLEE: | WILLIAM JACOB LONG IV CHRISTOPHER DANIEL MEYER |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED, VACATED, AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED, VACATED, AND RENDERED IN PART - 08/22/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. This adverse possession/prescriptive easement case involves a wall between two properties in downtown Cleveland, Mississippi. David Alford (David) sued Cotton Row Hospitality LLC (Cotton Row) in the Bolivar County Chancery Court to confirm title to the wall by adverse possession and/or establish a prescriptive easement for its use. After a trial,

the chancery court held, among other things, that David had valid claims of adverse possession and to a prescriptive-easement claim to half of the wall. But because Cotton Row owned the rest of the wall, the chancery court ordered David to pay Cotton Row for title to that half of the wall, and David would thereafter own the entire wall, i.e., with free and clear title. The chancery court also ordered David to either construct his own support system or reimburse Cotton Row for the value of its investment in stabilizing the wall.

¶2. Although David appeals from the chancery court's judgment, he does not dispute the chancery court's finding of his ownership to at least a portion of the wall by adverse possession and a prescriptive easement for its use. But David contends, among other things, that the chancery court erred by requiring him to pay Cotton Row for the remainder of the wall and Cotton Row's costs for constructing the support system (if he chose to accept the system rather than building his own). Cotton Row cross-appeals, claiming that David was barred from relief under the doctrine of unclean hands and that he had not proved the elements of adverse possession or prescriptive easement. After reviewing the record, the arguments of the parties, and the relevant caselaw, we affirm the chancery court's judgment in part and reverse, vacate, and render in part.

**Facts**

¶3. In the mid-1950s, Arnold and Jean Alford (the Alfords) rented a building in downtown Cleveland, Mississippi, from H. O. Solomon to operate a furniture store. On October 30, 1975, the Alfords purchased the property next door, south of the furniture store, from Automotive Parts Company, a Mississippi corporation. This property contained a

2

building, which the Alfords used as a frame shop, and two approximately eleven-foot-wide uncovered, non-public alleyways on each side. One alleyway separated the frame shop from the furniture store building. The furniture store building was located closer to the street, and the frame shop was set back a few feet.

*1975 Enclosure of the Alleyway*

¶4. In 1975, the Alfords enclosed the alleyway on the north side of the frame store that ran between the frame shop and the furniture store. They built walls on the back and front of the alleyway, attaching both to the walls of both buildings. They also extended the roof over the area, attaching it to the exterior side of the furniture shop's wall. This created 792 square feet of new interior space for the frame shop. The Alfords made a doorway from the furniture store into the alleyway area so they could go back and forth between the two buildings. They built shelves on both sides of the furniture shop wall—shelves for their use in the now-extended frame shop and shelves on the inside of the furniture shop. There was no proof in the record that Solomon, who owned the furniture store property, objected when the Alfords created this extension to the frame shop's building by using the exterior of the wall of the furniture shop. Nor was there any proof that Solomon had permitted this use either.

*Transfer of Other Alleyway*

¶5. On March 19, 1980, the Alfords conveyed the alleyway on the south end of the frame shop property to the City of Cleveland. The city anticipated building on the property, and in the deed, the Alfords agreed that the city could use the thirteen-inch masonry wall of the

3

frame shop to attach its new building. The deed specifically referred to this as a "party wall," and the city agreed to close in the existing windows and door on the wall and to move the electrical outlets and light fixtures on the interior side of the wall that the Alfords would use.

¶6. The Alfords continued to lease and operate the furniture store until 1981 when they sold the business. When the Alfords vacated the furniture building, they filled in the doorway between the alleyway/storage area of the frame shop and the furniture store building. At this point, the Alfords only owned the frame shop building, which included the area that had been enclosed by attaching a roof to the furniture store.

*Sale of the Furniture Shop Property to the Perrys*

¶7. On January 23, 1985, Solomon's widow and only heir sold the furniture store property to Billy and Mary Perry, who opened a pawn shop. Billy Perry testified that when they purchased the property, the Alfords had already enclosed the alleyway and had extended the roof, which was attached to the pawn shop wall. The Perrys never objected to the roof extension after they obtained title to the pawn shop. As he testified, "it was never discussed."

¶8. But the Perrys still considered the entire pawn shop building to be theirs, including the wall to which the Alfords had affixed the extended roof. The Perrys operated their business in the entire building and maintained the building, including the interior side of the wall. Perry testified that he had electricity wires along that wall, where he displayed his TVs. The Perrys also painted the exterior portion of the wall that jutted out to the street beyond the frame store and posted a sign identifying their pawn shop business. No one objected to the Perrys' use of the wall during the time that they owned the pawn shop from 1985 to 2017.

4

Moreover, the Perrys never sought or received permission from the Alfords to use the wall either. The record reflects that the Perrys and the Alfords operated peacefully with the buildings configured as they were.

¶9. In addition, it was clear to the public that the Alfords' roof was attached to the pawnshop building. John Valentine, a retired attorney who served as Cleveland's city attorney and a county and youth court judge, testified about this at trial. He said that sometime in the 1970s, the Chamber of Commerce and the City worked on a joint project to give the storefronts a facelift by requiring the owners to install awnings, canopies, and eaves. Valentine said that at that time and thereafter, it was clear to anyone walking down the street that the frame shop and pawn shop buildings were connected.

*Transfer to David*

¶10. After Jean and Arnold Alford passed away, on June 23, 2009, their children had the building appraised by Lucy Capocaccia. In her appraisal, she noted:

> In addition to the main building structure, there is a narrow addition to the building on its north side, which measures approximately 11' x 72'. This is actually where the alley used to run between this property and the property north of it and was purchased by the property owner and enclosed. It is considered to be unfinished storage area.

Thereafter, three of the four Alford children deeded their interests in the frame shop property to their brother David, who had worked in the frame shop since 1993. By this conveyance, David became the sole owner of the frame shop property. After he became owner, David put another doorway into the frame shop's interior wall of the enclosed alleyway, so there were two entrances from the shop. He said he later made the alleyway area into a gallery with a

5

small stage.

*Hotel Construction*

¶11.    In 2016, David learned that a group of investors had planned to build a hotel in the area.  David attended several Cleveland Heritage Commission meetings and confirmed that Cotton Row was going to purchase the pawn shop property from the Perrys to construct the hotel.  David began emailing Cotton Row executives asking what was going to happen with his alleyway roof when the pawnshop wall was taken down.  He asked for compensation for the loss of his roof when what he referred to as the "common wall" between the two buildings would come down.  David also contacted architects for the proposed hotel to discuss his "loss of the 800 feet in my alley."  On February 12, 2017, Donald Alford (David's brother) wrote Cotton Row about the contemplated construction as well.  Donald inquired if the plans provided adequate separation between the buildings for fire safety.  He also asked how the wall would be stabilized before and after demolition.

¶12.    On May 12, 2017, Cotton Row finalized its purchase of the pawn shop property from the Perry family.  Cotton Row's title report and a survey of the property (completed by Robert Eley on May 25, 2017) showed no issues with the chain of title or boundaries.  Eley found that no part of the pawnshop building encroached onto David's property.

¶13.    Demolition of the pawnshop began in October 2017.  Those doing the work alerted Clay Scruggs, one of Cotton Row's developers, that one of the walls of the pawnshop had the roof of the building next door attached to it.  Scruggs stopped the demolition work and arranged to meet with David.  In anticipation, David prepared a list of options for handling

6

the demolition of the wall. One included establishing the property line and retaining the wall with structural reinforcement. A second option involved demolishing the wall and building a new wall for the frame shop building with windows, doorways, HVAC relocation, and storefront rehabilitation. The third option was a partial demolition of the wall, leaving it about six feet high (still with structural reinforcement) and pergolas over the alleyway area, creating an outdoor gallery and event space. David expected Cotton Row to pay for the work required in all these options.

¶14.     David presented his three options in the meeting in November 2017 with Mike Harrell of the Probity Contracting Group (the general contractor) and the Cotton Row developers, Luke Chamblee and Clay Scruggs, along with other construction personnel. Scruggs said that they looked at the frame shop space, which appeared to him to be a storage space. Cotton Row's representatives said they would consider David's proposals, but Chamblee said he was confused about why they should have to pay for improvements to David's frame shop.

¶15.     Two days later Scruggs met with David at the frame shop. Scruggs told David that he had discussed the proposals with their investors, and their decision was to "do no more than help support the roof." Scruggs said that the wall would still come down pursuant to the plans and that David needed to detach his roof from their wall. David asked Scruggs to leave, and there was no further discussion of any other alternative solutions to their problem. David said he retained counsel that day to handle the matter.

¶16.     Shortly after the meeting, Chamblee emailed David and asked to meet again to discuss

the matter and perhaps reach a compromise. David responded that he could not meet due to his holiday business schedule and referred Chamblee to his attorneys. David said that the following week, he received a letter from Cotton Row telling him that he had five days to remove the wall. After that time, when David emailed Chamblee, David then referred to the wall as "my wall," and not a "party wall" or "common wall."

¶17.    Between December 2017 and February 2019, both parties took unilateral actions concerning the property without seeking court intervention.[1]  Needing to adhere to a strict construction timetable because of financial constraints, Cotton Row decided to leave the pawn shop wall in place "until the wall issue was resolved." Cotton Row proceeded to build the hotel set back from the pawnshop wall, leaving the wall free-standing. To support the wall, however, Cotton Row spent $40,000 to temporarily "shore up" the wall. Cotton Row later spent an additional $20,000 installing structural steel beams encased in concrete attached to the foundation of the hotel. Cotton Row contended that it took these actions to protect the wall, the hotel, its employees, and eventually its guests.

¶18.    In June 2018, when David learned that Cotton Row was not going to demolish the wall, he installed a new roof over the original roof covering the alleyway area. David testified that the old roof remained, and he added two inches of foam insulation that was screwed into the old roof and then applied a membrane over that. But this new roof now extended over the top of the pawn shop wall rather than simply being attached to one side.

¶19.    David hired Terry Smith to survey the boundaries of the frame shop property in

---

[1] The record contains no information of any further negotiations between the parties or with attorneys during this period.

8

August 2018. Smith reported that the wall was on the property line between the property owned by David and the property owned by Cotton Row. But Smith returned to the property just a few days before trial in 2020. At that time, he revised his findings and confirmed that most of the wall in dispute was on Cotton Row's property with only 1/4 inch at the ends being on David's property. Smith also testified that from his review of the definition of a "party wall" in Black's Law Dictionary, he felt the wall in contention was a party wall because both the Alfords and the Perrys had used it. He admitted, however, that the Alfords had no written agreement with the Perrys for a party wall like the Alfords had put in their 1980 deed to the city.

*Court Proceedings*

¶20. On March 1, 2019, David filed suit in the Bolivar County Chancery Court to confirm his title to the pawn shop wall by adverse possession or establish a prescriptive easement for its use. In the complaint, David sought an order giving him ownership of the entire pawnshop wall to which he had affixed his roof and for a prescriptive easement to use five feet of Cotton Row's property to maintain the wall.

*Motion Hearing and Trial*

¶21. On August 14, 2020, a month before trial, Cotton Row filed a motion for summary judgment, to which David responded. In his response, David argued not only that he had ownership of the wall by adverse possession and/or an easement to it as he had pleaded, but he also argued that the wall in question was a "party wall" because both he and the Perrys had used the wall. Cotton Row countered that David had not pleaded a claim based on this

"party wall" theory. On the first day of the trial held on September 21-22, 2020, the chancery court heard their arguments and denied Cotton Row's summary judgment motion.

¶22. The chancery court then proceeded to hear testimony from the parties. At trial, the following witnesses testified: Surveyor Smith, Attorney Valentine, Donald Alford,[2] David, Appraiser Capocaccia, Perry, Chamblee, Surveyor Robert Eley, and Clay Scruggs. Each testified to the facts listed above.

*July 12, 2021 Chancery Court Final Order and Opinion*

¶23. After considering the testimony and proof presented by the parties, the chancery court entered its final judgment (see *supra* ¶2) on July 12, 2021. After reciting the facts and procedural history of the case, the chancery court posed and answered several questions. In answering these questions, the chancery court found that no portion of the pawn shop building ever rested on the frame shop property, so the Alfords had no title to any portion of the wall by deed.[3] But the court also found that the Alfords had established a valid adverse possession claim "to a very limited portion" of the wall, namely only to the depth of the

---

[2] Donald Alford, David's brother and an architect, confirmed their father's enclosure of the alleyway back in 1975. He also testified that when he learned of the hotel project, he wrote to Cotton Row in February 2017 about his construction concerns especially because the wall between the frame shop and the pawnshop acted as a firewall. By December 2017, Donald received the hotel construction plans and saw that the wall would be retained and supported. He wrote Cotton Row again in December to confirm his understanding of the plans. Donald also testified that it was possible for David himself to build a new wall on his own property to hold up his roof.

[3] The chancery court noted the different testimony of the surveyors who testified and found that the wall had varying dimensions. The court found that "it is unreasoned to say that a fourth (1/4) of an inch at the end of the wall gave David some perceived ownership by deed."

10

"bolts, latches and other connective materials" used to connect the original roof over the alleyway. The chancery court held that the pawn shop wall was never a "party wall" because the Alfords had never paid for an interest in half of the wall, and no proof was presented of any agreement between the Alfords and the owners of the pawnshop property to use it as a party wall.

¶24. Further, noting that the elements of a prescriptive easement were similar to those of adverse possession, the court held that the Alfords also had a prescriptive easement to use the wall but only to the depth that the Alfords inserted their construction materials. The chancery court was concerned that David attempted to expand his claim to ownership prior to filing suit by recently installing a roof over the top of the wall. Moreover, the court found that in response to David's actions, Cotton Row had to insert structural setbacks on its own property to shore up the wall. The chancery court found that David's actions interfered with Cotton Row's use of nearly five feet of its own property.

¶25. The chancery court noted that the wall was now used only by David, but because of the deteriorated relationship between the parties, it was not feasible for him to go onto Cotton Row's property to maintain the wall's exterior side. The chancery court sought to fashion an equitable remedy for the wall's maintenance given various factors, including the fact that the property was located in a historic district, that the governing authorities had approved the existence of the current wall, that the wall has always belonged to various owners of the pawn shop building and the owners of the frame shop. The court found that it was unreasonable to require that the wall be torn down, moved less than a foot, and rebuilt to

11

support David's roof.  Finally, the chancery court found that Cotton Row had taken the only reasonable option given its deadlines, i.e., supporting the wall.

¶26.    The chancery court then ordered David to remove the current support for the wall that Cotton Row had constructed.[4]  David had a maximum of 100 days to do this unless the parties agreed to extend the deadline.  The court further ordered that after completion of the change in structural support, David pay Cotton Row the fair market value of one-half of the wall and that Cotton Row convey to David clear title to the wall upon payment.  The chancery court also ordered that David be liable for any harm caused to anyone after Cotton Row transfers ownership of the property; that Cotton Row had the right to review the plans for structural stabilization of the wall as planned by David; and that the parties were responsible for their respective attorney's fees and costs.

*Motions to Alter, Amend, or Clarify the July 12, 2021 Order*

¶27.    Both parties filed motions to alter, amend, and/or clarify the chancery court's final judgment pursuant to Rule 59 of the Mississippi Rules of Civil Procedure.[5]  In his motion,

---

[4] This would require David to construct supports for the wall on his side if he determined they were needed.

[5] Mississippi Rule of Civil Procedure 59(a) provides:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of Mississippi; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of Mississippi.

On a motion for a new trial in an action without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings

12

David argued, among other things, that he should not have to remove Cotton Row's support system and construct new support.

¶28. On October 5, 2021, the chancery court heard arguments on the motions. Cotton Row opposed changing the judgment's provision that required David to remove the support system and construct his own on his own property. Cotton Row pointed out that even if it conveyed the wall to David, anyone injured because of the wall would hold Cotton Row liable as the entity that constructed the support system. The issue of the extent of the foundation for the wall was discussed, and so was whether this would affect the extent of real property that would need to be included in the transfer deed to David for the entire wall and its support structure. The chancery court gave the parties time to consult with engineers to determine the exact nature of the support system in place and perhaps reach a compromise.

¶29. After the hearing, the parties filed supplements to their Rule 59 motions concerning the extent of the support system. Cotton Row reported it had determined that "holes were drilled into the ground between where the hotel now sits and the wall, steel beams were attached to the wall and run into the holes, and then said holes were filled with concrete." However, Cotton Row could not determine if the support system overlapped with the foundation of the hotel itself without digging down twelve feet to inspect the foundation. Cotton Row further argued that the issue of ownership beyond the wall was first raised at the October 5, 2021 hearing. If Cotton Row were required to sell a portion of its real property beyond the wall, Cotton Row requested full reimbursement of all its costs ($58,000).

---

of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

13

¶30. David's post-hearing filing included an affidavit from the contractor Michael Harrell, who built the hotel. In it, Harrell stated that the wall supports were free-standing and have no connection to the hotel's foundation. Harrell confirmed that holes were bored just north of the wall, concrete was placed in the holes, and steel supports were attached to the pilings and bolted to the wall. David attached pictures of this work. David also argued that Cotton Row would have been liable to David for damages for interfering with his prescriptive easement to the wall. Accordingly, David contended that Cotton Row was legally required to do what it did and that David should not have to pay.

¶31. No compromise was reached. Cotton Row filed a motion to strike David's post-trial evidence (Harrell's affidavit and photos).

*January 3, 2022 Order*

¶32. On January 3, 2022, the court issued an order that re-affirmed its July 2021 findings that the Alfords only used one-half of the wall to support the roof of its frame shop extension until David recently "took the unprecedented step" of running his roof line over the top of the wall. The court found it was "highly convenient that [David] Alford needed to do major roof line work on the frame shop after Cotton Row refused to meet any of his financial demands" and his "use of the wall to support the roof of the frame shop did not require the use of the entire wall prior to his hostile actions in 2019."

¶33. The chancery court noted the extreme hostility between the parties and the need for them to be "physically and legally severed from each other." Thus, although a prescriptive-easement holder may normally be given the right to enter onto the property of another to

14

enforce the prescriptive rights, in this case the chancery court found that "allowing even the most minimum connections between the parties will cause untold community disruption and contentious litigation." The court recognized that it was difficult to require Cotton Row to sell prime realty, yet the court affirmed that Cotton Row was required to convey David its half of the wall upon David's payment.[6]

¶34. Further, the chancellor had inspected the property and observed the steel-rod wall that Cotton Row had built. The court held that when David acquires the wall, Cotton Row is entitled to the full value of the land and the improvements. The chancery court granted Cotton Row's motion to strike post-trial evidence and found that for purposes of fashioning a remedy, the court would consider the support to be connected to the foundation. The court found that Cotton Row made a significant investment in the installation of the steel-rod wall next to the wall. The court found that the investment benefitted both parties and that David should not be rewarded just because he established a prescriptive easement. The court's order stated, "Thus, the [c]ourt herein would rule that if Alford wishes to acquire the steel rod wall, Cotton Row is entitled to the full value of the land and improvements."[7] The chancery court further required that the color and appearance of the wall must remain

[6] The order provided that the parties would agree on an appraiser to value the wall and property being transferred. If they could not agree on an appraiser, the parties had thirty days to submit three names to the court, and the court would choose the appraiser.

[7] The court also ordered that "should an agreement be reached between the parties regarding the ownership of the steel rod wall, Cotton Row would be entitled to the value of the land and all improvements." Keeping in mind that the unaltered provisions of the July 12, 2021 order remained in effect, we understand the court to be holding that if David decides to accept the wall with the improvements rather than constructing his own, then the wall should be valued with the value of the support system included.

compatible with the current state of the wall and comply with city building codes. Further, until the wall was conveyed to David, both parties remained liable for any harm caused by the overhang from David's roof. The court ordered David to maintain insurance on the wall. Once Cotton Row conveyed the wall to David, the court ordered that, because the steel rod wall that had been installed adequately provided structural support, there was no need for David to access Cotton Row's property for maintenance or inspection. The chancery court also ordered that a surveyor be retained to "shoot" a straight line for the wall and write a legal description. The parties would equally share that cost. The court reaffirmed all other rulings in its July 12, 2021 judgment that were not altered by the January 2022 order.

*Appeals*

¶35. On January 27, 2022, David appealed both the July 12, 2021 final judgment and the January 3, 2022 order. On appeal, David presents the following: (1) the chancery court did not err in finding that the Alfords had adversely possessed and established a prescriptive easement of the wall; (2) the chancery court erred in finding that David's claim of adverse possession was limited to one-half of the wall; (3) the chancery court erred in requiring David to pay for property he adversely possessed; (4) the chancery court erred in requiring David to pay Cotton Row to secure the wall; (5) the chancery court erred in imposing other financial and legal burdens on David.

¶36. On February 4, 2022, Cotton Row cross-appealed, arguing that: (1) David had "unclean hands" and should have been precluded from any equitable relief; (2) David's claim of prescriptive easement was not pleaded and should not have been considered by the

16

court; (3) David failed to prove all elements of adverse possession or prescriptive easement; and (4) David's failure to prove adverse possession or prescriptive easement precludes him from entering Cotton Row's property to maintain the wall.

¶37.    We have restructured both parties' arguments and address them below.

**Standard of Review**

¶38.    The Mississippi Supreme Court noted in a recent adverse possession case that on appeal the chancery court's factual rulings are reviewed under an abuse of discretion standard. *Crotwell v. T & W Homes*, 318 So. 3d 1117, 1121 (¶11) (Miss. 2021). "Questions of law are reviewed de novo," and "[t]he findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Id*. Despite the deference given, "if the chancery court's findings were manifestly wrong or the court applied an erroneous legal standard this Court will not hesitate to reverse." *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992).

**Discussion**

I.      **Whether David is precluded from equitable relief under the unclean hands doctrine.**

¶39.    Before filing suit, and once David knew there was a dispute concerning the wall, David replaced the roof extension over the alleyway and changed how it attached to the pawnshop wall. Cotton Row contends that this unilateral action precluded David from receiving any relief from the courts under the "unclean hands doctrine." The chancery court made no specific ruling on this issue. However, the court did note in its January 3, 2022, order:

17

> [David] Alford only utilized one half of the Wall to support the roof of his Frame Shop until he took the unprecedented step of running his roof line to the top of the Wall and down the opposing side of the Wall after the Pawn Shop was sold to Cotton Row in May 2017. The court finds it highly convenient that [David] Alford suddenly needed to do major roofline work on the Frame Shop after Cotton Row refused to meet any of his financial assistance requests.

Despite stating this, the chancery court granted David relief, which implies that the court rejected Cotton Row's unclean-hands argument.

¶40. The application of the unclean hands doctrine as an equitable bar is limited. *Anderson v. Jackson*, 338 So. 3d 629, 649 (¶53) (Miss. Ct. App. 2022). The Mississippi Supreme Court has stated that the unclean hands doctrine means that "no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity." *In re Est. of Richardson*, 903 So. 2d 51, 55 (¶15) (Miss. 2005) (quoting *O'Neill v. O'Neill*, 551 So.2d 228, 233 (Miss. 1989)). Keeping in mind that "[t]he chancellor sits as the finder of fact, and the chancellor's findings of fact will not be disturbed unless there is manifest error," *id.* at 56 (¶18), we find no error with the chancery court's ruling on this issue. In this case, although David unilaterally extended his roof, Cotton Row also unilaterally decided not to seek judicial intervention but rather to keep the wall and reinforce it despite the considerable expense. Neither party gained a legal advantage by their pre-trial maneuvers because the proof of the key legal issues—adverse possession and prescriptive easement—reaches back prior to David and Cotton Row's recent actions. Accordingly, we find the chancery court did not err in hearing the case rather than precluding either party from relief under the unclean hands doctrine.

**II.    Whether the chancery court was precluded from considering**

18

**David's prescriptive easement claim because of inadequate pleading.**

¶41. Cotton Row also contends that David was barred from receiving any relief under his prescriptive easement claim because he allegedly did not plead it as a cause of action. We disagree because David begins his complaint by stating that he is filing his action "to confirm title to certain real property *and to a prescriptive easement.*" (Emphasis added). Further, in paragraphs 16-17, David specifically pleaded the elements that create a prescriptive easement and stated:

> Plaintiff and his ancestors have utilized a small strip of Defendant's property for over forty-five (45) years to access and maintain the exterior of Plaintiff's wall and roof. Plaintiff's and his ancestors' use of the easement satisfies all the conditions for a prescriptive easement under Mississippi law.

In his "prayer for relief," David specifically requested an order confirming his "title in a prescriptive easement." Although he requested an easement over five feet of Cotton Row's property for the wall's maintenance, Cotton Row was certainly put on notice that the issue of the existence and extent of a prescriptive easement was included in the case. "Mississippi is a 'notice pleading' state." *Nelson v. Nelson*, 271 So. 3d 613, 617-18 (¶13) (Miss. Ct. App. 2018) (quoting *Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 157 (¶35) (Miss. 2011)). "Under Rule 8, a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and 'a demand' for judgment." *Id.* (citing M.R.C.P. 8). Accordingly, the chancery court did not err in considering David's prescriptive easement claim.

**III.    Whether the chancery court erred in finding that David had a viable adverse possession or prescriptive easement claim to the**

**wall.**

¶42.    The chancery court found that David had presented sufficient proof to establish all elements of adverse possession to half of the pawnshop wall, as well as a prescriptive easement to the use of it. Both parties appealed different portions of this ruling. Cotton Row contends that David had failed to prove that his use was exclusive, continuous, and hostile. David argues that the chancery court erred in finding that the wall was not a party wall and that he had only adversely possessed half, not all, of the wall.

*Elements of Adverse Possession and Prescriptive Easement*

¶43.    Mississippi Code Annotated section 15-1-13(1) (Rev. 2019) provides that a party may claim property after ten years of actual adverse possession.[8] To establish a claim of adverse possession, David must show that his or his predecessors' possession of the wall was "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Anderson*, 338 So. 3d at 641 (¶25) (citing *Frazier v. Frazier*, 31 So. 3d 1218, 1220 (¶6) (Miss. Ct. App. 2009)). A party who claims adverse possession must show by clear and

---

[8] Section 15-1-13(1) provides:

> 1) Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title, saving to persons under the disability of minority or unsoundness of mind the right to sue within ten (10) years after the removal of such disability, as provided in Section 15-1-7. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than thirty-one (31) years.

convincing evidence that each element has been met. *Orcutt v. Chambliss*, 243 So. 3d 757, 762 (¶15) (Miss. Ct. App. 2018) (citing *Ellison v. Meek*, 820 So. 2d 730, 734 (¶13) (Miss. Ct. App. 2002)).

¶44.  "[T]he standard and burden of proof to establish a prescriptive easement is the same as a claim of adverse possession of land." *Franco v. Ferrill*, 342 So. 3d 1176, 1191 (¶43) (Miss. Ct. App. 2022).  To establish a prescriptive easement, the claimant must show by clear and convincing evidence that his "use" of the property was (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years.  *Id*. (citing *London & Stetelman Inc. v. Tackett*, 308 So. 3d 445, 451 (¶17) (Miss. Ct. App. 2020)).

¶45.  Although the general standard for establishing a prescriptive easement and adverse possession is the same, different property interests result.  *Tackett*, 308 So. 3d at 452 (¶18). "A successful claim of adverse possession results in the claimant receiving *ownership* of the property while a successful claim for a prescriptive easement results in the claimant receiving an easement to *use* the property." *Id*. (emphasis added) (citing *Knight v. Covington County*, 27 So. 3d 1163, 1170 (¶28) (Miss. Ct. App. 2009)).

¶46.  There is also a difference between the exclusivity requirement that must be proved in adverse possession and the exclusivity of use that must be shown to establish a prescriptive easement.  In cases of adverse possession, "[e]xclusive possession means that the possessor evinces an intention to possess and hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant's conduct must afford an unequivocal indication that

21

he is exercising the dominion *of a sole owner*." *Revette v. Ferguson*, 271 So. 3d 702, 711 (¶25) (Miss. Ct. App. 2018) (emphasis added) (citing *Roberts v. Young's Creek Inv. Inc*., 118 So. 3d 665, 671 (¶15) (Miss. Ct. App. 2013)). "Exclusivity, within the meaning of the statute, means that the adverse possessor's use of the property was consistent with an exclusive claim to the right to use the property." *Apperson v. White*, 950 So. 2d 1113, 1119 (¶15) (Miss. Ct. App. 2007).

*Exclusivity in Adverse Possession*

¶47. To illustrate, in an adverse possession case, *Lynn v. Soterra Inc*., 802 So. 2d 162 (Miss. Ct. App. 2001), we affirmed the chancery court's finding that Soterra and Buford had proven exclusive use of a disputed tract of land by their actions indicating a claim to sole ownership, even though they had given others permission to use it. *Id*. at 168 (¶20). Addressing the exclusive possession element of adverse possession, we stated that "the quality and quantity of possessory acts . . . may vary[,] . . . [but] [t]he question in the end is whether the possessory acts relied upon by the would be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder upon notice that the lands are held under an adverse claim of ownership." *Id*. at 167 (¶17). We pointed out:

> Buford and Soterra did have exclusive use in this sense, as someone with perfect title does not endanger it by giving permission to others to enjoy the property as well. The other users are not hostile to the owner, since they are using with implied or explicit permission. The key factor on exclusivity is that Buford exercised the rights consistent with the authority to exclude. There was evidence that others would call Buford and ask his permission to use the road.

*Id*. at 168 (¶17). Thus, the adverse possessors actually proved their intent to be the sole owners by showing that others recognized their claim and sought permission from them to

22

use the property. *Id*. We held that such use did not undermine the exclusive possession of the adverse possessors. *Id.*

¶48.    Similarly, in *Moran v. Sims*, 873 So. 2d 1067, 1070 (¶13) (Miss. Ct. App. 2004), although we began examining the elements of a prescriptive easement, we found that Sims had established adverse possession of a driveway. In that case, Moran's property surrounded Sims' on three sides, and Sims' access to the state highway was on a driveway across Moran's property. *Id*. at 1068 (¶2). Testimony at trial established that Sims and his predecessors had used the driveway for over fifty years, *id*. at 1069 (¶3), and that Sims had purchased gravel for the driveway as well. *Id*. at (¶9). Although a school bus driver testified that he had driven the bus down the driveway to pick up children in 1956 and 1957, *id*. at (¶6), we stated that "'[e]xclusive' use does not mean that no one else used the driveway. Exclusivity here means that the use was consistent with an exclusive claim to the right to use." *Id*. at 1070 (¶10). We noted that the driveway was used by the Sims family and those whom they permitted to do so and that their home was the only one on the driveway. *Id*. We found sufficient proof to establish exclusive use, *id*., and concluded that "the elements of adverse possession were sufficiently proven." *Id*. at (¶13).

*Exclusivity in Prescriptive Easement*

¶49.    In contrast, the Mississippi Supreme Court found that the element of exclusivity in establishing a prescriptive easement was different from the exclusivity required in an adverse possession case in *Keener Properties L.L.C. v. Wilson*, 912 So. 2d 954 (Miss. 2005). There Wilson claimed a prescriptive easement of ingress and egress along a road that crossed the

Keener property. *Id*. at 955 (¶2). Keener claimed that Wilson had not proven the exclusive use element needed to establish a prescriptive easement arguing the *Lynn* definition of exclusivity. *Id*. at 956 (¶5). But the Supreme Court limited the application of the *Lynn* case, stating:

> Keener's use of the *Lynn* case to establish the requirements of a prescriptive easement is acceptable, but the use of the case in order to define the term "exclusive" is not viable because of *the subtle distinctions which exist when using the term in relation to adverse possession and a prescriptive easement*.

*Id*. at 957 (¶8) (emphasis added). Citing *Board of Trustees of University of Mississippi v. Gotten*, 119 Miss. 246, 80 So. 522 (1919), and *Jenkins v. McQuaid*, 153 Miss. 185, 120 So. 814 (1928), the Supreme Court noted that the fact that a roadway or alleyway had been open to the public at large did not affect the prescriptive easement claim by either Gotten or Jenkins. *Keener*, 912 So. 2d at 957 (¶9). The Supreme Court quoted *Jenkins*, stating:

> An individual may acquire an easement of way by adverse use[] though at the same time the public uses the way. It is therefore not necessary for the use of the alley by Jenkins to have been exclusive of all other persons; others, also, may have used it as a means of ingress and egress to their property. If Jenkins, under a claim of right, used the alley constantly for the statutory period, improving and keeping it in condition for his use, as testified by him (which testimony is not disputed), then his right thereto became perfect and irrevocable after such statutory period of time, and is as efficacious in vesting in him the enjoyment of such right as though it had been formally conveyed in writing.

*Id*. (quoting *Jenkins*, 120 So. at 816).[9] Thus, use of property by others does not preclude the establishment of a prescriptive easement.

---

[9] It is noted, however, that the ten years' use of an easement establishes only a right to that *use*. It does not vest *title* to the property as does a finding of adverse possession pursuant to Mississippi Code Annotated section 15-1-13.

*Joint Use*

¶50.     Although joint use does not defeat a prescriptive easement claim, *Paw-Paw Island Land Co Inc. v. Issaquena and Warren Counties Land Co.*, 51 So. 3d 916, 926 (¶41) (Miss. 2010), we have held that joint use is insufficient to establish adverse possession. *Riverland Plantation P'ship v. Klingler*, 942 So. 2d 294, 298 (¶14) (Miss. Ct. App. 2006).   In *Riverland*, Klinger, d/b/a Kingspoint Farms, owned the property adjoining Riverland Plantation that both parties used for hunting camps and was accessible only by a four-wheeler. *Id*. at (¶2).  When a dispute arose over approximately twenty-nine acres along the property boundary, Kingspoint filed suit to quiet title and Riverland counterclaimed that it had acquired ownership by adverse possession. *Id*. at 296 (¶4).  The chancery court found that Riverland had failed to prove adverse possession, *id*. at 297 (¶10), and we affirmed, finding that Riverland had failed to prove exclusivity by clear and convincing evidence. *Id*. at 298 (¶14).   We pointed out that both parties used the disputed property, specifically Kingspoint had placed deer stands on the property. *Id.*  We cited *Gadd v. Stone*, 459 So. 2d 773, 774 (Miss.1984), which dealt with a boundary dispute concerning a barbed wire fence, for the proposition that jointly using property did not establish adverse possession. *Riverland*, 942 So. 2d at 298 (¶14).

¶51.     We have recently cited *Riverland* in *Winters v. Billings*, 281 So. 3d 75, 82-83 (¶22) (Miss. Ct. App. 2019), where we affirmed a chancery court's finding of no adverse possession because there was no exclusive use shown when both parties had used the disputed property.  In that case, the Billingses had a survey done in 1984 and erected a picket

25

fence and later a chain-link fence ten feet north of their southern boundary line. *Id*. at 79

(¶2). The Winterses purchased the neighboring land and maintained the fence and surrounding area, and used the property just south of it for barbecue events, softball and volleyball. *Id*. at (¶3). Billings testified that he talked to one of the Winterses about the property line and gave him permission to use the land; the man denied this discussion of permission occurred. *Id*. When a survey showed that the fence which had been destroyed was really ten feet north of the Billingses' property line as the Billings originally contended, they sued to adjudicate their ownership. *Id*. at 79-80 (¶6). The Winterses alleged ownership of the property by adverse possession. *Id*. at 80 (¶7). The chancery court denied the Winterses' claim, *id*. at (¶8), and on appeal, we affirmed. *Id*. at 83 (¶23). Besides agreeing that the Winterses had failed to prove some of the other elements of adverse possession, we noted that both accessed and used the property. *Id*. at 82 (¶22). We pointed out that the Winterses had erected nothing to exclude the Billingses from the land and that the Billingses had, among other things, kept their side of the fence cut. *Id*. Finding that the Winterses had not shown exclusive use by clear and convincing evidence, we affirmed the chancellor's judgment. *Id*.

*Application of Precedent to this Case*

¶52. In this case, David did not prove by clear and convincing evidence the exclusive use needed to establish adverse possession of the wall. He and his parents indisputably jointly used the wall, first with Solomon as the owner of the furniture store building and then with the Perrys when they purchased it to create the pawnshop. David and his parents never

26

"permitted" the Perrys to use the wall, nor did they act in such a manner to indicate that they were claiming sole ownership of it in its entirety. Additionally, because the wall was jointly used, David did not establish adverse possession of even half of it because the Perrys were using the entire wall to support their pawnshop. David's and his parents' use was not indicative of an intention to assert sole ownership of the wall, and we hold the chancery court erred in finding that David had proved adverse possession of the wall or even a part of the wall.

¶53.    However, we affirm the chancery court's finding that David had proved his right to a prescriptive easement for the use of the wall because the exclusivity requirement of a prescriptive easement does not require a showing of use to the exclusion of all others. David and his parents used the wall, in whole or in part, to support the roof of the alleyway for the ten years required to establish a prescriptive easement.[10] Although the use was joint with the Perrys, it still was use that satisfied the exclusivity requirements as noted in *Kenner* and *Jenkins*.

¶54.    Because he holds a prescriptive easement for the use of the wall, David enjoys certain protections and rights. In easement cases, the easement holder (the dominant estate) and the owner of the land subject to the easement (the servient tenement) must not interfere with each other's use. *Kennedy v. Anderson*, 881 So. 2d 340, 346 (¶25) (Miss. Ct. App. 2004). For example, in *Kennedy*, we held that the owner of the dominant estate (the easement holder of a road) is entitled to work on the easement at his own expense so as to keep it reasonably

---

[10] *See supra* note 8; *Tackett*, 308 So. 3d at 452 (¶18).

usable as a road. *Id.* (citing *Lindsey v. Shaw*, 210 Miss. 333, 340, 49 So. 2d 580, 584 (1950)). Moreover, the servient landowner cannot damage the easement over his property. *Muirhead v. Cogan*, 158 So. 3d 1259, 1264 (¶22) (Miss. Ct. App. 2015). In *Muirhead*, siblings divided land they had inherited from their parents. *Id.* at 1260 (¶3). They reserved a twenty-foot-wide easement over the parcel given to Muirhead. *Id.* Other heirs later abandoned the easement after Muirhead built a new road and culvert, which washed away the gravel on the easement. *Id.* at 1261 (¶6). At some point, Muirhead dug a large v-shaped ditch across the easement, preventing its use by Cogan, the remaining heir who was dependent on the easement to get to her land. *Id.* Cogan hired a contractor to fill in the ditch, but shortly thereafter, she found a trench dug in the center of the easement where water settled, causing severe erosion. *Id.* at (¶7). In the lawsuit and appeal that followed, we deferred to a chancery court's finding that Muirhead had destroyed a gravel road easement and that Muirhead was liable for compensatory damages for the easement's destruction. *Id.* at 1265 (¶23). In the case before us, because David has established a prescriptive easement to the use of the wall, Cotton Row as the servient landowner cannot destroy the wall, or it would be liable to David for damages if it does.[11]

### IV. Whether the chancery court erred in finding that the pawnshop wall was not a party wall.

¶55. To the chancery court, David contended that the pawnshop wall became a "party wall" because his parents and the Perrys jointly used it. The chancery court rejected this argument

---

[11] Again, David's rights flow from his prescriptive easement, not from any *title* ownership interest in the wall because he did not establish adverse possession pursuant to Section 15-1-13.

28

because the pawnshop property owners (first, the Alfords and Solomon, then the Alfords and the Perrys, and finally David and the Perrys) had no written or oral agreement to use the wall as a party wall. We agree with the chancery court.

¶56. In Mississippi, the creation of a party wall is addressed in Mississippi Code Annotated section 89-15-3 (Rev. 2021), which provides:

> If the owner of any lot shall build a substantial and durable brick or stone wall on the line which divides his lot from another, and the owner or lessee of that other lot should desire to erect an adjoining building and connect the same with the building already erected, so as to make the wall of the former building serve as the wall of his own, he may do so by paying to the owner of the first wall half the value thereof, or half the value of so much of the former wall as he may use as a wall to his own house; but he shall not be at liberty to use the former wall in any way which may prove dangerous or detrimental to the owner, except he may close lights therein.

Key elements then for the creation of a party wall include: (1) the wall be built on the property line, (2) the party desiring to connect to the wall of an adjoining building pay the owner of the wall half of the value, and (3) the parties formally agree to make the wall a party wall. The agreement itself flows from and confirms the mutual ownership rights of the parties. The statute further provides that the agreement between the two property owners is binding regardless if it is written.[12]

¶57. Entering into an agreement to establish a party wall affords the co-owners mutual protections and imposes mutual responsibilities.

---

[12] See Mississippi Code Annotated section 89-15-1 (Rev. 2021):

> Any agreement for erecting walls which parties may make who own adjoining lots and desire to build party walls, shall be binding, whether in writing or not; and in case of the failure of either party to comply with his contract, the other may have an action for damages.

> [Owners of a party wall] are burdened by certain obligations to each other, which they cannot arbitrarily ignore; that whether they own the wall as tenants in common, or each owns one half in fee simple and has an easement in the other half, this ownership or easement cannot be destroyed or brought to an end by one proprietor removing the party wall without the other's consent, unless the condition of the wall justifies it. These principles are consonant with common sense and justice.

*Hoffman v. Kuhn*, 57 Miss. 746, 748-49 (1880).

¶58. An example of an agreement to establish a party wall is found in *Lexington Lodge, No. 24, F. & A.M. v. Beall*, 94 Miss. 521, 49 So. 833, 833-834 (1909). In that case, the Lodge owned the south half of lots 60 and 61 in the city of Lexington and Samuel Hoskins owned the north half. *Id.* at 833. After his death, Hoskins's administrator confirmed in a deed that during his lifetime, Hoskins conveyed a six-foot strip of land on the edge of his property to the Lodge "upon the condition that Hoskins should have and enjoy the right or privilege of connecting with the then contemplated Masonic Hall . . . ." *Id.* The Mississippi Supreme Court held that "the evidence leaves no doubt that the mutual intention was that the wall should be used as a party wall." *Id*.

¶59. In this case, the Alfords were clearly aware of the need for an express agreement with a neighboring landowner to create a party wall because they included such language in the deed conveying the other alleyway to the City of Cleveland in 1980. However, David presented no proof of any oral or written agreement between his parents and Solomon or the Perrys for their joint use of the pawn shop wall. Moreover, the wall was not built on the boundary line but was erected solely on the furniture store/pawnshop property, and the Alfords paid nothing for its use. Therefore, the wall did not meet the requirements of the

30

statute to create a party wall.

¶60. Recognizing this deficiency, David now argues that his *prescriptive use* of the wall made it a party wall and cites *Denson v. George*, 642 So. 2d 909 (Miss. 1994), as authority. First, we note that David did not plead that he had rights to the wall because it was a party wall in his complaint; he did not raise this claim until he responded to Cotton Row's motion for summary judgment. Even then, he only argued that his joint use of the wall made it a party wall. He did not argue his alternative theory that his prescriptive use of the wall made it a party wall to the chancery court—not in his summary judgment response or in his Rule 59 motion. An issue not raised to the trial court may not be raised on appeal. *Harrison v. Howard*, 356 So. 3d 1232, 1246 (¶45) (Miss. Ct. App. 2023) (quoting *Austin v. State*, 971 So. 2d 1286, 1288 (¶8) (Miss. Ct. App. 2008)). "Before an issue may be assigned and argued in this Court, it must first be presented to the trial court." *Id*. (quoting *Williams v. Dep't of Hum. Servs.*, 116 So. 3d 176, 181 (¶12) (Miss. Ct. App. 2013)). Accordingly, David is procedurally barred from now arguing that his prescriptive use of the pawnshop wall made the wall a party wall.

¶61. Notwithstanding the procedural bar, we find there is no Mississippi precedent to support David's argument. The case he cites, *Denson*, reached no decision on whether prescriptive use creates a party wall. The *Denson* case involved two buildings that appeared to share a wall between them that extended above the roofline. *Denson*, 642 So. 2d at 914. However, the testimony of a contractor revealed that the two buildings in fact had two separate walls (one for each building) and they did not share a wall. *Id*. Because of this

*physical* fact, even though Denson testified that the prior owners had agreed to the joint use the alleged party wall, the Mississippi Supreme Court concluded that no party wall existed between the two buildings. *Id*. In the alternative, Denson then argued that his and his neighbor's roofs were attached to the wall that extended above the roofline. *Id*. at 915. Denson contended that his roof depended on that wall for support and that the wall then became a party wall by prescription. *Id*. The Supreme Court reviewed the statute on the creation of a party wall, Mississippi Code Annotated section 89-15-3, and held that it required the construction of a single wall that services both parties. *Id*. Because the facts showed that no single wall was built, the statute was not satisfied. *Id*. The Court noted that it was possible for the chancellor to conclude that Denson had acquired a prescriptive easement to attach his roof to the wall "even though the wall was not a party wall." *Id*. But the Supreme Court declined to address the issue of whether a prescriptive use had been established because the issue had not been appealed. *Id*. Accordingly, *Denson* did not hold that a prescriptive use could create a party wall.

¶62. Although creators of a party wall also have easements of use to the other party's half, *see Binder v. Weinberg*, 94 Miss. 817, 48 So. 1013, 1016-17 (1909),[13] establishing an easement by prescription of use of a wall does not bestow on the easement holder ownership of the wall. *Delancey v. Mallette*, 912 So. 2d 483, 488 (¶16) (Miss. Ct. App. 2005) ("[T]he 'claim of ownership' element in an action for prescriptive easement is not a claim to take title

---

[13] In *Binder*, the Mississippi Supreme Court noted that the creation of a party wall (i.e., by an express agreement of the parties to share in the use of a wall built on the common boundary line of the property of each), also created mutual easements of use as a result of their agreement. *Id*. at 1017.

to a strip of land over which an easement runs, but rather it is a claim to own the easement itself."). Therefore, although David established a prescriptive easement to use the wall, he did not establish ownership of (i.e., title to) the wall.[14] Although a prescriptive easement grants the holder many of the protections and responsibilities, including the right to use the wall, as held by owners of a party wall, the easement does not transform the wall into a legally established party wall. Accordingly, we find no error in the chancery court's rejection of David's party wall argument.

## V. Whether the chancery court erred in requiring Cotton Row to convey David its interest in the wall.

¶63. Because we hold that David did not establish ownership of the wall by adverse possession, the ownership of the wall continued to be held by the Perrys and now Cotton Row. Although David holds a prescriptive easement to the wall's use, there is no legal basis to require Cotton Row to divest itself of the wall, and we reverse and vacate the part of the

---

[14] David cites other jurisdictions as if they have held that prescriptive easements have created party walls. However, these cases merely deal with situations similar to the case here; namely, when there is no agreement to create a party wall, can a party still establish a prescriptive easement for its use. For example, in *Waterman S.S.Corp. v. McGill Institute*, 149 So. 2d 773, 779 (Ala. 1961), the Court discussed only whether the use of a building's wall by an adjoining landowner to build a garage created a prescriptive easement, not whether that use made it a "party wall." Another case David cites, *Sobien v. Mullin*, 783 A. 2d 795, 798 (¶8) (Pa. Super. Ct. 2001), also turned on whether Sobien had established a prescriptive easement to use a wall:

> Under the undisputed facts here presented, the wall in question was wholly upon Mullin's property and thus not a true party wall as contemplated by statute. Nor was there a scintilla of evidence of any express grant or intention to treat it as a party wall by the builder. Thus, the Sobiens' right to use Mullin's wall was wholly dependent upon the finding of a prescriptive easement.

chancery court's judgment ordering the survey, valuation, and conveyance of the wall.

> **VI. Whether the chancery court erred in requiring David to pay Cotton Row for securing the wall.**

¶64. In both its judgment and order, the chancery court noted the amount of money that Cotton Row had spent to reinforce the wall. In the July 12, 2021 final judgment, the court ordered David to remove the support system Cotton Row had installed, indicating David could build his own system on his property. In his post-judgment motion, David informed the court that the system Cotton Row had constructed was adequate and did not need to be removed. After considering the parties' post-judgment motions, the chancery court gave David an alternative option in its order revising the final judgment. If he chose to accept the support system, then he could pay Cotton Row for the land on which it was built, as well as the value of the system. On appeal, David contends that the chancery court erred in this ruling and argues that because he had established a prescriptive easement to use the wall, Cotton Row was prohibited from interfering with that use. We agree.

¶65. As noted above, in easement cases, the owner of the land subject to the easement must not interfere with the easement holder's use. *Kennedy*, 881 So. 2d at 346 (¶25). In that case, we held that the owner of the dominant estate (the easement holder of a road) was entitled to work on the easement at his own expense so as to keep it reasonably usable as a road. *Id*. (citing *Lindsey*, 210 Miss. at 340, 49 So. 2d at 584). In *Lindsey*, the Supreme Court held that a gate across a private way did not have to be removed, but nailing it shut or keeping it locked was an unreasonable interference. Moreover, tung trees along the easement roadway had grown so big to make the easement almost completely obstructed. *Id*. The Supreme

Court ordered the landowner to remove the tree obstructions and, thereafter, it ordered the easement holder to make any other repairs on the roadway. *Id.* at 584. In *Muirhead*, 158 So. 3d at 1265 (¶24), we found sufficient evidence to warrant the payment of damages by the servient landowner who destroyed a gravel roadway easement.

¶66. Because we affirm that David has established a prescriptive easement to the use of Cotton Row's wall, Cotton Row must not interfere with that use or risk liability for damages. Accordingly, when Cotton Row destroyed three walls of the pawn shop and determined the need to reinforce the wall that remained, Cotton Row was merely fulfilling its obligation not to damage or destroy David's use of the wall.[15] Thus, we reverse the part of the chancery court's judgment requiring David to pay Cotton Row for its costs in supporting the wall. However, as the holder of a prescriptive easement to use the wall, David has the responsibility to maintain and repair the wall in the future. *Fratesi v. City of Indianola*, 972 So. 2d 38, 43 (¶14) (Miss. Ct. App. 2008) (citing *Fourth Davis Island Land Co. v. Parker*, 469 So. 2d 516, 523 (Miss. 1985) ("[T]he dominant owner of an easement has the burden of maintenance and repair, and to this end has an implied secondary easement to enter the servient property to perform the necessary maintenance and repair.")). Therefore, under *Fratesi*, David has the right to protect his easement and the responsibility to maintain it. Accordingly, he is entitled to accessibility to Cotton Row's side of the wall if needed for future maintenance.

## Conclusion

---

[15] We note that Cotton Row did not counterclaim for the reimbursement of these expenses.

¶67. We affirm the chancery court's finding that David was not barred from relief by the doctrine of unclean hands and that David was not procedurally barred from relief on his claim for a prescriptive easement for the use of the wall. We further affirm the chancery court's rejection of David's claim that the wall was a party wall and affirm the court's ruling that David had established a prescriptive easement for the use of the wall. But we reverse the chancery court's ruling that David had established an ownership interest in the wall by adverse possession.

¶68. We hold that David has no ownership interest in the wall, which is located on Cotton Row's property and was included in Cotton Row's deed. Cotton Row has free and clear title to the entire wall. Therefore, there is no equitable need for Cotton Row to be ordered to sell it to David. Accordingly, we reverse and vacate the part of the chancery court's ruling concerning the survey, valuation, and transfer of title to the wall by Cotton Row to David.

¶69. Again, we hold that David has proved that he has a prescriptive easement for the use of the wall. David has a duty to maintain his easement, but he may not unreasonably interfere with Cotton Row's property rights. Because David holds a prescriptive easement for the wall's use, Cotton Row may not demolish the wall or otherwise interfere with David's easement. When Cotton Row tore down the other three pawnshop walls, Cotton Row was obligated to support the remaining wall if it determined the wall needed reinforcement. Accordingly, we reverse the part of the chancery court's ruling requiring David to reimburse Cotton Row for its expenses in supporting the wall.

36

¶70.  Because there will be no removal of the structural supports constructed by Cotton Row, the provisions of the chancery court's judgment concerning David's liability for any harm caused by the wall's removal and David's obligation to maintain insurance to cover any such harm are unnecessary and vacated.

¶71.  **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED, VACATED, AND RENDERED IN PART.  ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED, VACATED, AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**